# Moses Bros. *et al. v.* Home Building and Loan Association.

*Bill in Equity to Establish Priority of Mortgage Lien and for Foreclosure.*

1. *Usury a personal defense.*—Usury is a personal defense, and can be interposed only by the borrower or his legal representatives.

2. *Plea of usury must state the facts.* In a suit to foreclose a mortgage given to secure a loan, a plea that "usurious interest was charged for said loan" is insufficient; the facts showing usury must be alleged.

3. *Homestead claim not available against purchase-money mortgage.* Homestead right can not attach as against a mortgage executed contemporaneously with sale for the purchase-money.

4. *No right in general creditors to require mortgagee to first resort to personal security.*—The fact that a second mortgagee, to induce the first mortgagee to waive the priority of his mortgage as against a third mortgage, becomes surety for the debt secured by the first mortgage. gives subsequent creditors of the mortgagor no right to demand that the first mortgagee shall first endeavor to collect his demand out of such surety.

5. *Right of surety to stand on terms of contract as made.*—A surety for the debt or duty of another has a right to stand on the very terms of his contract as made and agreed to by him, and if by a binding agreement between the creditor and principal debtor any material change is made in the contract, to which the surety's assent has not been obtained, it absolves the latter whether the change increases his liability or not.

6. *Same as to guarantors.*—When property is mortgaged or pledged by the owner to answer for the debt, default, or miscarriage of another person such property occupies the position of a surety or guarantor, and anything which would discharge an individual surety or guarantor who was personally liable, will, under similar circumstances, discharge the property.

7. *Same; case at bar.*—Where the first and second mortgagees of land, to enable the mortgagor to obtain a loan from a building and loan association, indorsed on the record of the respective mortgages an agreement that said mortgage should be subordinate to the lien of a third, executed to the association, and at the time of obtaining said loan the mortgagor pledged 100 shares of stock which he held in the association, on which he was to pay $40 per month for seven or eight years, and about three years later the mortgagor surrendered

[Moses Bros. et al. v. Home Building and Loan Association.]

his stock to the association, received, in lieu thereof, 75 shares of another series, on which he was to pay $30 per month for seven or eight years, and have a new mortgage on the property to secure the balance of the loan, it being understood, without the assent of the first and second mortgagees, that the new arrangement should supplant the first one, the first and second mortgagees stood in the position of sureties, and the change in the contract released them from their agreement to allow priority to the claims of the association.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. JOHN A. FOSTER.

The bill in this case was filed by the Home Building & Loan Association against Moses Bros., J. R. Adams, W. R. Nalls, and certain judgment creditors of said W. R. Nalls; and prayed to have foreclosed two mortgages.

The two mortgages which were sought to be foreclosed by the plaintiffs, were executed by Nalls, one on January 9, 1885, and the other on June 6, 1888.

Upon the final hearing of the cause on pleadings and proof, the chancellor decreed a sale of the property, and that out of the proceeds thereof, the register pay, first, the cost and expenses of the suit and sale.

Second, the sum due with interest, on the mortgage to complainant made on January 9, 1885.

Third, the amount due on the mortgage made to Moses Bros.

Fourth, the amount due on the mortgage made to J. R. Adams.

Fifth, the sum due on judgments recovered by certain creditors before the execution of the second mortgage, and

Sixth, the amount due to the complainant on the second mortgage executed on June 6, 1888, after deducting therefrom whatever is paid on the preceding mortgage to secure the same debt.

All the other facts are sufficiently stated in the opinion.

RICHARDSON & REESE, LESTER C. SMITH, and BRICKELL, SEMPLE & GUNTER for the appellants.

ARRINGTON & GRAHAM for the appellee.

STONE, C. J.—The real question of merit in this case is that of priority and order of lien of the various creditors, on the real property which is the subject of the suit. Moses Brothers, J. R. Adams and Home Building and Loan Association are mortgagees of the property their mortgages bearing date in the order stated. The other contesting

claimants are judgment creditors, who assert no claim of lien on the property by virtue of any contract made. Their claims rest in part on judgments recovered and recorded, and in part on executions issued and placed in the hands of the sheriff. They do not claim, or pretend that the property in contest is of sufficient value to pay off the mortgage liens as set up, and leave a surplus for them. Their contention is that the mortgage liens are largely usurious and unjust, and that consequently they should be postponed or subordinated, at least in large part, to their said judgment or execution liens. This contention rests mainly on the alleged usury in the claims of J. R. Adams and of the Home Building and Loan Association.

It was early declared in this State that usury is a personal defense, and can only be interposed by the borrower, his legal representative or heir at law. "Usury is a defense personal to the party agreeing to pay it, or those who stand in his place as representatives."—*Fenno v. Sayre,* 3 Ala. 458. That doctrine was ever afterwards adhered to.—*Harrison v. Harrell,* 19 Ala. 753 ; *Gray v. Brown,* 22 Ala. 262 ; *Cain v. Gimon,* 36 Ala. 168 ; *McGuire v. Van Pelt,* 55 Ala. 344; *Griel v. Lehman,* 59 Ala. 419 ; *Butts v. Broughton,* 72 Ala. 294.

When usury is interposed as a defense, the facts which constitute it must be specifically set forth. Speaking on this subject, and quoting from Tyler on Usury, we said : "that the debtor 'must in his answer or plea, both at law or in equity, set up the usury specifically, stating distinctly and correctly the terms of the usurious agreement, and the amount of the usurious premium.' And the pleader is cautioned to make this defense, 'bearing in mind always that the courts are more rigid and technical in their practice in cases of usury than in ordinary cases of equity jurisdiction.'"—*Munter v. Linn,* 61 Ala. 492. This doctrine has been ever since followed in this court. *Bradford v. Daniel,* 65 Ala. 133; *Security Loan Asso. v. Lake,* 69 Ala. 456; *Masterson v. Grubbs,* 70 Ala. 406 ; *Burns v. Campbell,* 71 Ala. 271; *Kilpatrick v. Henson,* 81 Ala. 464 ; *Welsh v. Coley,* 82 Ala. 363; *Woodall v. Kelly,* 85 Ala. 368.

W. M. Nalls was the alleged borrower of the money from the Home Building & Loan Association, and he is made a defendant in this foreclosure suit. All that is shown by him as a plea, or attempted plea of usury to this bill to foreclose is in the following language found in his answer: "Respondents aver that usurious interest was charged for said loan." This is wholly insufficient to raise the defense

[Moses Bros. et al. v. Home Building and Loan Association.]

of usury, and this case must be tried without any reference whatever to that defense.

The defense of usury being eliminated from the record, we find the following ascertained sums to have been due to the several mortgagees at the time the account was taken, and the report of the register confirmed—April 20, 1892 :

To Moses Brothers........................$ 3,900.45
" J. R. Adams............................ 1,273.08
" Home Building & Loan Association...... 1,552.70

Total of these three debts......... ...$ 6,726.23

Interest on these sums make them now over $7,500. It is clear that these sums, not taking into the account the costs of this suit, decreed to be paid out of the proceeds of sale, will more than exhaust the value of the property embraced in this suit; the value being shown by agreement of counsel to be between four and five thousand dollars. But we need not inquire whether this agreement binds or affects the judgment creditors—those having no contract lien or security; for under no circumstances have they or either of them any lien or claim that is not subordinate to the rightful claim of the three mortgage creditors named above. Nor is there any controversy between the judgment creditors as to which of them has the prior or paramount claim as between themselves. The decree declares the order of their payment, and as between them, the rightfulness of that order is not questioned.

The debt to Moses Brothers was created in the purchase of the property which is the subject of this suit. It is oldest in point of time, the mortgage being dated October 3, 1883 ; and there is no averment or proof that it was not executed contemporaneously with the purchase of the property from Moses Brothers. Homestead right can not attach against this claim. Nor can any subsequently contracted debt by Nalls acquire a paramount lien on the real estate purchased, unless by force of some act done, or agreement entered into by Moses Brothers. This debt, then, was and is *prima facie,* the first lien on the property.

The second lien was given, or attempted to be given to Adams. It was given to secure the repayment of $1,500, borrowed money, and the note and mortgage bear date February 27, 1884; the debt due in twelve months. It conveys the real property purchased from Moses Brothers, "together with the improvements and appurtenances, consisting principally of one large lathe, one 20 inch joiner,

one 24 inch planer, one 36 inch re-saw machine, one im-
proved scroll saw, one boring machine, one emory wheel,
with shop and fixtures." This mortgage was signed by
Nalls alone, without the concurrence of his wife.

The third mortgage was made to the Home Building &
Loan Association, and bears date January 9, 1885. It was
signed by Nalls and his wife, and was recorded. It was
not, however, so acknowledged and certified as to convey
the homestead. It conveyed only the realty. This convey-
ance was sufficient in its granting clause to carry with it
all machinery which became a part of the freehold, save as
this question may be affected by the homestead claim, to be
considered further on.

Before the Building & Loan Association made a loan to
Nalls on the security of the lot involved in this litigation, it
required that the repayment of its loan should be guaranteed
and made sure by a first lien or security on the property.
This involved the necessity of obtaining from Moses Broth-
ers and from J. R. Adams their consent that the security to
the Building & Loan Association should be paramount to
theirs. J. R. Adams appears to have been active, and pos-
sibly would be benefitted by the loan to Nalls, and to induce
Moses Brothers to give the required consent, he indorsed
and became surety or guarantor of the purchase-money
notes for the lot which Nalls owed Moses Brothers. Carry-
ing this agreement and purpose into effect, both Moses
Brothers and J. R. Adams severally made and signed this
indorsement on the record of the mortgages Nalls had pre-
viously given to them, described above, namely : "Jany 9,
1885. For value received we hereby agree that the lien
created by this mortgage on the property herein described
shall operate as a second lien, and be subordinate to the
lien created by a mortgage executed on the day above stated
by W. M. Nalls and wife to the Home Building & Loan
Association." Upon the execution of these consents by
Moses Brothers and by J. R. Adams, Nalls obtained the loan
from the Building & Loan Association, and executed the
mortgage described above to secure its repayment.

Before and up to June 6, 1888, Nalls made monthly pay-
ments to the Building & Loan Association, and at that time
the admitted balance of his debt to that corporation was
$1,800. When he first obtained the loan—January 9, 1885—
he was a stockholder in the corporation, owning 100 shares
of stock, of the par value of $40 per share. These shares,
together with the lot mortgaged, were pledged for the repay-
ment of the money borrowed. On June 6, 1888, a new

agreement was entered into between Nalls and the Building & Loan Association, the terms agreed on and carried into effect being as follows : Nalls was allowed a credit for the then value of 100 shares in the B. & L. Association, and they were surrendered up and cancelled. They had been issued in series No. 1, and would probably mature and extinguish the loan in about seven or eight years from January 9, 1885. The new agreement of June 6, 1888, was made to assume the form of a new loan of the balance, $1,800, as of that date, which would probably mature and become extinguished by payment in seven or eight years from that date. To support this new agreement, and to give it its proper form, 75 shares of stock were issued to him, also to be held in pledge for the payment of the unpaid residue of the money lent; and under this new agreement the loan and stock were placed in series No. 2. Under the original contract, and under the laws of the association, Nalls was required to make and did make monthly payments of $20 interest, and $20 in the form of dues and calls on his stock, for his 100 shares of subscribed stock—aggregating $480 of payments per annum. Under the new agreement monthly payments were $15 of interest, and $15 of dues or calls on stock, aggregating $360 per annum.

A mortgage on the lot was also executed by Nalls and wife to secure compliance with the new agreement of June 8, 1888; and unlike the mortgage first given to the B. & L. Association, it was so acknowledged and certified as to bind and pledge any homestead right Nalls and wife may have had in the property.

There is an agreement in the transcript, signed by the solicitors of each of the mortgagees—(Moses Brothers, J, R. Adams and the Home Building & Loan Association)—"that at the date of complainant's mortgages the property embraced therein was occupied by Nalls and wife as a homestead." This is an admission by these parties that on January 9, 1885, and on June 6, 1888, the lot in controversy was the homestead of W. M. Nalls; but it is no admission that it was such before that time. There is no other proof in the record bearing on the question of homestead occupancy.

The question of homestead *vel non* is an immaterial inquiry in this case. The debt to Moses Brothers is unpaid purchase-money for the lot, secured by a mortgage given at the time of the purchase and homestead exemption is unavailing against such debt. So, the debt to Adams was incurred, and the mortgage executed February 27, 1884. There is no

proof in the record that the lot was Nalls' homestead at that time, and hence the question of homestead claim as against Adams is not shown to have any foundation in fact. We need not further consider the question of homestead as against Moses Brothers and J. R. Adams.

Nor is this claim of homestead a material defense against the debt to the Home Building & Loan Association. True, in the first mortgage to that association—that of January 9, 1885—the acknowledgment and certificate were not such as would bar the right of homestead. But all that remained unpaid of that debt was renewed, preserved, and secured by the mortgage of June 6, 1888. That mortgage was acknowledged and certified so as to bar homestead claim. It is thus shown that to the extent of all that is left unpaid of the debt to the Building & Loan Association, the homestead claim is cut off and barred. That claim is without merit, so far as the liability of the property to the mortgage debts is concerned.

The question of usury, and the questions growing out of the claim of homestead, are not raised by the mortgage creditors, nor insisted on by them. They have no assignments of error which make those inquiries material or pertinent. It is only the judgment creditors who seek to raise these questions. The result of our rulings above, and the large amounts thus shown to be due the mortgagees, all of which have a lien on the property, prior and paramount to any claim the judgment creditors can assert, is to show clearly that only the mortgagees are interested in the proceeds of the real estate. It is manifest that under no circumstances will there be a surplus left after paying the mortgage debts. Any claim or pretense, that because Adams, to induce Moses Brothers to permit the Building & Loan Association to have a first lien, became surety or guarantor of the purchase-money debt Nalls owed them, he thereby armed other or subsequent creditors of Nalls with the right to demand that they, Moses Brothers, should first collect their demand out of Adams, finds no sanction in the doctrine of marshalling assets.—*Dollins v. Lindsay*, 89 Ala. 217. Nor need we consider whether, at the suit of the judgment creditors, Adams can be compelled to exhaust his lien on the personal property embraced in his mortgage (possibly otherwise exempt), before he will be permitted to share in the proceeds of the real estate, which is also covered by his mortgage. It is obvious this is a question in which the judgment creditors have no interest; for the real property, supplemented with the personal property embraced in the

mortgage to Adams, will not pay in full the mortgage debts, which have the paramount lien.

As we have shown, Moses Brothers and J. R. Adams made an agreement that the loan to be made to Nalls by the B. & L. Association should be a first lien. On the strength of this agreement the loan was made; and it is not controverted that by virtue of that agreement and the loan made on the strength of it, the Building & Loan Association did acquire a paramount lien on the property. The contention of appellants is, that the agreement of June 6, 1888, was a novation and change of the contract, giving to Nalls a materially enlarged term within which to make payment, exacting small or monthly installments, and that this being done without their consent, absolved them from their agreement to make the B. & L. loan a first lien; and remitted them to their original rights of first and second lienees.

We think it very clear that the consummated agreement between Nalls and the B. & L. Association, of date June 6, 1888, was a novation—the entering into a new contract, having changed security, prescribing different methods of payments, and extending the time of final settlement. By the original agreement, made January 9, 1885, Nalls pledged his 100 shares of stock as security, and bound himself to pay $40 every month until the borrowed money debt should be thereby extinguished. Failing to make these monthly payments, as required by the by-laws of the corporation and by the terms of his contract, the mortgage would have been forfeited and subject to immediate foreclosure. Making the monthly payments, as stipulated, the mortgage debt would be paid in full, say in 1892 or 1893. Under the substituted contract of June 6, 1888, the 100 shares of stock were surrendered up and cancelled, 75 shares of new stock issued to Nalls, an agreement entered into to pay $30 per month until the debt should be extinguished, and the 75 shares of stock placed in pledge for a faithful compliance with the new contract. Under this second agreement, if its terms were never so faithfully complied with, the debt would not become extinguished within a shorter term from its date than the original debt would have from its date. This would probably delay the maturity until 1895 or 1896. This was an extension of more than three years, and it is manifest that if Nalls should comply with the terms of the second contract in the matter of making the agreed monthly payments, the Building & Loan Association had estopped itself from enforcing the contract of January, 1885, either by foreclosing that mortgage or otherwise. This was clearly a no-

vation.—16 Amer. & Eng. Encyc. of Law, 862 *et seq.;* 3 Brick. Dig. 152, § 146.

It is a long and well established doctrine that a surety for the debt or duty of another has a right to stand on the very terms of his contract as made and agreed to by him. And if by a binding agreement · between the creditor and principal debtor any material. change is made in the contract, to which the surety's assent has not been obtained, this absolves the latter, whether the change increases his liability or not.—3 Brick. Dig. 715, §§ 36 *et seq.*; Brantt on Suretyship, § 342 ; *Rees v. Berrington,* 2 Ves. jr. 540; *King v. Baldwin,* 2 Johns Ch. 554. And guarantors are deemed sureties in the application of ·this principle. So, if one pledge his property as security for another's debts, he like a personal surety, can invoke this doctrine. It is a doctrine in the interest of good faith, and is highly favored in the law. "When property of any kind is mortgaged or pledged by the owner to answer for the debt, default or miscarriage of another person, such person occupies the position of a surety or guarantor and anything which would discharge an individual surety or guarantor who was personally liable, will, under similar circumstances, discharge the property." 1 Brandt on Suretyship § 34.

In leading cases in equity, Vol. 1, part 1, page 137, is this language : "Every one is a surety within these principles who incurs a liability in person or estate at the request and for the benefit of another, without sharing in the consideration."

The case of *Rowan v. Sharp's Rifle Mfg. Co.* 33 Conn. 1, was very much like the present one in principle. In that case Robbins & Lawrence had executed a mortgage on real estate to Sharp's Rifle Co., as security that they would repay to the latter certain advances made to them, R. & L., to be used in the manufacture of rifles. After this contract was entered into, Robbins & Lawrence made a contract with Fox & Henderson to manufacture for them a large quantity of rifles, the rifles to be made "with all possible dispatch." They, R. & L., were to receive an advance from Fox & Henderson, the repayment of it to be secured by a mortgage. Upon the solicitation of both parties—Robbins & Lawrence and Fox & Henderson—The Sharp's Rifle Company released certain of the property conveyed to it by Robbins & Lawrence, so far as to enable the said R. & L. to give to Fox & Henderson a first mortgage lien thereon, for the repayment of the money to be advanced by them. This agreement was carried into effect, the release executed, the mortgage given and the money advanced.

[Moses Bros. et al. v. Home Building and Loan Association.]

Under the contract as first made, and as it stood when the Rifle Company released its mortgage, Robbins & Lawrence, as we have shown, were bound to manufacture the rifles "with all possible dispatch." Subsequently, and without the consent of the Rifle Company, a supplemental contract was entered into by which Robbins & Lawrence bound themselves to Fox & Henderson that three hundred rifles per week should be delivered for a certain named time, and six hundred per week thereafter, until the whole number should be delivered. The details of the first contract were changed in other particulars, not necessary to be noted. It was held by the court that under this agreement the Sharp's Rifle Company had all the rights of sureties to the contract, and that the property pledged for the performance was discharged by such changes as would have discharged a personal surety upon the contract. Held further that the changed terms agreed on for the delivery of the rifles was such a change of the contract as to discharge the surety.

The case of *Poland v. Lamoile Valley Railroad Co. et al.* 52 Ver. 144, decides that a release of priority of lien, such as was executed by Moses Bros. and by Adams, is only an equitable mortgage or pledge of the mortgage interest vested in them, and making that interest a security for the debt, in favor of which the release was executed. Applying that principle to this case, Nalls was the principal in the debt to the Building & Loan Association, and the mortgage interests of Moses Brothers and of Adams, stood in the relation of sureties for Nalls that he would pay the debt. The consideration moved to Nalls, and he was the debtor. As between them, it was neither the debt of Moses Bros., of Adams, or of their property; for if he, Nalls, had paid the debt in full, he would have had no recourse against them, or against the mortgaged property, for the recovery of the money paid or for contribution. See Jones on Corporate Bonds, § 38; 1 Jones on Mortgages, § 942; 17 Amer. & Eng. Encyc. of Law, 917; *Gahn v. Niemcewiez*, 11 Wend 312; *Lewis v. Palmer*, 28 N. Y. 271; *Price v. Reed*, 13 N. E. Rep. 754; *Cherry v. Monro*, 2 Barb. Ch. 618; 3 Paige 614.

If it be considered essential to the application of the principle stated that knowledge should have been traced to the Building & Loan Association of the relations Moses Bros. and Adams sustained to the property, the answer is that the very paper executed by Moses Bros. proves such knowledge beyond all peradventure. And the original bill

[Moses Bros. et al. v. Home Building and Loan Association.]

filed in this cause by the Building & Loan Association asserts in substance that such was the fact, and it rests its claim of paramount lien on the property, on the said agreement of waiver which Moses Bros. and Adams entered into, and which, it says, induced and caused it to lend its money to Nalls.

Under the principles declared above we hold that the Home Building & Loan Association has discharged Moses Bros. and J. R. Adams from the binding effect of the waiver they entered into in favor of the Home Building and Loan Association, and that this case must be tried and decreed as if no such waiver had been given.

The decree of the chancellor is reversed. Let the costs of appeal, alike in the court below and in this court be paid by the Home Building & Loan Association.

Proceeding to render the decree the chancery court should have rendered, it is ordered and decreed that after payment of the costs of the suit out of the proceeds of sale, as decreed by the chancellor, the remaining proceeds will be applied, First, to the payment to Moses Brothers or who ever is rightfully entitled to that claim, the amount reported and confirmed to be due to them, with interest thereon from the date of the report : Second, to the payment of the sum reported and confirmed as due to J. R. Adams, with like interest : Third, to the payment to the Home Building and Loan Association the sum reported and confirmed as due to it, with like interest.

In all things else relating to the sale of the land, the making of title to the purchaser and the distribution of the proceeds, the decree of the chancellor is adopted and affirmed.

The register will report his proceedings under this decree to the chancery court.

It is not intended in this opinion to decide anything in reference to the personal property, proper, alleged to have been carried to Birmingham. It does, however, include fixtures which were a part of the freehold. We have not considered the effect of the alleged levies under execution at law.

Reversed and rendered.